**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CDW LLC and CDW GOVERNMENT LLC,<br><br>Plaintiffs,<br><br>v.<br><br>MOJAVE ADVANCED SOLUTIONS, INC., RYAN HOGAN, MARK HARRINGTON, KELLEY DOBNER, and BILL WATTON<br><br>Defendants. | ) | Case No. 1:26-cv-09869 |

**PLAINTIFFS' COMPLAINT**

Plaintiffs CDW LLC and CDW Government LLC (collectively, "CDW"), for their Complaint against Defendants Mojave Advanced Solutions, Inc. ("Mojave"), Ryan Hogan ("Hogan"), Mark Harrington ("Harrington"), Kelley Dobner ("Dobner"), and Bill Watton ("Watton") (Hogan, Harrington, Dobner, and Watton, together, "Individual Defendants") (Mojave and Individual Defendants, together, "Defendants"), state as follows:

**INTRODUCTION**

1. This case arises from a brazen scheme by a trusted CDW employee to exploit his position of confidence, steal CDW's most valuable trade secrets and confidential information, and use that information to build a directly competing business, taking with him CDW's key personnel, customer relationships, and proprietary strategies, stripping CDW of a contract worth millions of dollars annually, and continuing to intentionally interfere with CDW's existing and prospective business relationships.

2. CDW is a Fortune 200 company and one of the nation's leading providers of information technology products, services, and solutions. CDW's government segment comprises

its customers of federal, state, and local agencies in the US. Within its federal group, CDW has certain team members focused on contracts and subcontracts related to work for the United States Navy (the "Navy Group").

3. Defendant Hogan joined CDW in 2016 to assist the Navy Group and, over the course of his tenure, advanced into the highly trusted and strategically significant role of Client Executive for a key CDW Government subcontract. In that senior, client-facing role, Hogan was entrusted with managing customer relationships, coordinating the delivery of enterprise IT solutions, developing CDW's marketing and sales strategies, and shaping the pricing structures and competitive roadmaps that guided CDW's growth and market position. CDW also entrusted Hogan with cultivating and maintaining CDW's relationships with key original equipment manufacturers ("OEMs"), giving him intimate knowledge of CDW's preferred OEM partners, negotiated discounts, incentive programs, procurement strategies, and vendor contacts.

4. While still employed by CDW and drawing a handsome annual compensation of approximately $1.5 million, Hogan hatched a scheme to compete against CDW and steal its employees, customers, and trade secrets. Indeed, in October 2025, while still employed by CDW, Hogan incorporated Defendant Mojave.

5. Like CDW, Mojave operates as a technology solutions provider delivering end-to-end IT products and services to commercial and government customers, offering the same core solutions as CDW and directly competing for the same customers and technology projects.

6. Despite operating a directly competitive business while still on CDW's payroll, Hogan did not separate his CDW work from his Mojave plans. Hogan even used his CDW email account to document notes and comments regarding his operation of Mojave.

7. While still employed at CDW, Hogan and Mojave began to identify and target key CDW employees in the Navy Group. Hogan and Mojave first recruited Defendant Harrington, a CDW employee with over twenty-five (25) years of experience, who served as an Account Manager in the Navy Group, including as the primary point of contact for one of CDW's significant federal customers. Hogan and Mojave, with the help of Harrington, further recruited Defendant Dobner, a Business Development Manager with approximately fifteen (15) years at CDW and subject matter expertise in the Navy Group. Hogan and Mojave next targeted Defendant Watton, a Senior Client Executive responsible for a portfolio exceeding $85 million who established CDW's Navy Innovation Center in San Diego, and Jason Reindel ("Reindel"), a Transformation Center Infrastructure Architect, both of whom worked in the Navy Group.

8. While owing confidentiality obligations to CDW, Individual Defendants left CDW taking with them CDW's confidential and trade secret information. In fact, Hogan took numerous documents regarding CDW's compensation structures and operations and also misappropriated CDW's confidential and trade secret information by recreating protectable and proprietary compilations of information from public sources.

9. Together, Hogan, Harrington, Dobner, Watton, and Reindel possess specialized knowledge of CDW's contract strategies, customer relationships, OEM relationships, pricing structures, and proprietary value propositions critical to CDW's future contract pursuits, particularly as they relate to the Navy Group. Mojave could not have commenced operations in such a short and accelerated period of time without improperly using CDW's confidential and trade secret information and leveraging Individual Defendants' knowledge thereof, and, in particular, could not have rapidly secured the requisite certifications that ordinarily require months, if not years, of investment and work to obtain, absent taking steps to obtain them while still

purportedly working on behalf of CDW and using the OEM relationships that Hogan, Harrington, Dobner, and Watton maintained on CDW's behalf.

10. The consequences for CDW were swift and severe. Immediately following Hogan's and Harrington's departures, a contract worth millions annually that Harrington had personally serviced as CDW's Account Manager and sole point of contact was placed out to bid to the detriment of CDW and benefit of Mojave, the very company Hogan had secretly built while still on CDW's payroll, using the confidential and trade secret knowledge and customer relationships that CDW had invested years and significant resources to develop.

11. But the harm to CDW has only just begun. Individual Defendants cannot work for and operate Mojave without relying on and using years' worth of confidential and trade secret information learned while employed with CDW. Why else would Hogan create a mirror-image company offering the same products and services, using the same OEMs, operating in the same area, employing the same employees, and servicing the exact same customers if not to "skip the line" and eliminate CDW as a competitor?

12. Rather than expending the years of financial investment, hard work, and time to develop a successful company, Hogan and Mojave are piggybacking off CDW's employee, OEM, and customer relationships and confidential and trade secret information that CDW cultivated and developed through years of investment and sweat equity.

13. Mojave, Hogan, Harrington, Dobner, and Watton continue to wrongfully rely on their knowledge of confidential and trade secret information regarding CDW's government suppliers and customers, including but not limited to price points and structures, pain points, negative information, needs, terms of agreement and negotiation with CDW, and preferences, as well as their intimate familiarity with CDW's relationship with the government customers and

suppliers with the purpose and effect of interfering with CDW's relationships, agreements, and future prospects with such customers and suppliers to the benefit of Mojave and detriment of CDW.

14. CDW has suffered and continues to suffer significant damages and irreparable harm as a result of Defendants' actions.

## PARTIES

15. CDW LLC is an Illinois limited liability company with its principal place of business in Vernon Hills, Illinois. CDW LLC is wholly owned by CDW Corporation, a Delaware corporation with its principal place of business in Chicago, Illinois.

16. CDW Government LLC is an Illinois limited liability company with its principal place of business in Vernon Hills, Illinois. CDW Government LLC is wholly owned by CDW LLC.

17. Mojave Advanced Solutions, Inc. is a California corporation with its principal place of business in Carlsbad, California.

18. Ryan Hogan is an individual who resides in and is a citizen of California.

19. Mark Harrington is an individual who resides in and is a citizen of Illinois.

20. Kelley Dobner is an individual who resides in and is a citizen of Illinois.

21. Bill Watton is an individual who resides in and is a citizen of California.

## JURISDICTION AND VENUE

22. Jurisdiction is proper in this District pursuant to 28 U.S.C. § 1331.

23. There is federal question jurisdiction under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq*.

24. The Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over any related state claims.

25. This Court has jurisdiction over Defendants and venue is proper in this District under 28 U.S.C. § 1391, *et seq.,* because (1) Harrington and Dobner entered into and breached contracts directly connected to Illinois; (2) Mojave, Hogan, and Watton tortiously interfered with business relationships based out of Vernon Hills and Chicago, Illinois; (3) Defendants' misappropriation of CDW's confidential and trade secret information occurred primarily in Illinois, and the resulting harm of which was principally felt by CDW in Vernon Hills, Illinois; (4) Defendants have and will inevitably misappropriate trade secrets and confidential information created and maintained by CDW in this district; and (5) Defendants' actions were expressly aimed to harm CDW in this district.

## GENERAL ALLEGATIONS

### I. CDW's Business.

26. CDW is a Fortune 200 company with more than 10,000 employees in the United States alone.

27. CDW is a leading provider of information technology products, services, and solutions to businesses, government agencies, educational institutions, and healthcare organizations throughout the country.

28. CDW works with original equipment manufacturers ("OEMs") to source its products, software, and offerings. CDW cannot operate its business without its strategic and critical OEM relationships.

29. CDW has spent years identifying, sourcing, and securing beneficial OEM relationships. Once identified, CDW engages in the standard, and sometimes years-long, process of working

with the OEM to understand its offerings, price points, strategies, and processes with the ultimate goal being a distributorship contract and certification. CDW engages in countless meetings with an OEM, sometimes in excess of a year, to allow CDW and the OEM to determine if the relationship is a good fit. This process requires significant investment from CDW, which spends considerable capital and people-hours in working with an OEM to assess whether the relationship makes business sense for both parties. CDW and the OEM negotiate each and every term of the distributorship contract during this potentially years-long process to finalize and obtain OEM and Service-Disabled Veteran-Owned Small Business ("SDVOSB") certifications necessary to be able to provide CDW's offerings and conduct business.

30. CDW heavily invests in acquiring and maintaining its long-standing customer relationships. To cultivate and maintain CDW's long-standing customer relationships, CDW charges certain of its employees with the responsibilities and duties required to maintain close relationships with CDW's customers and learn the customers' preferences, specifications, pain points, budget, needs, business strategy, and plans, among other things.

31. Throughout their employment with CDW, Individual Defendants were exposed to, and maintained ongoing access to, CDW's confidential information and trade secrets, including: (a) customer information, including customer identities, needs, preferences, pain points, purchasing histories, budgets, technology strategies, procurement plans, decision-makers, and relationship strategies of CDW's federal and commercial customers; (b) pricing information, including CDW's pricing methodologies, cost structures, margin analyses, competitive pricing models, pricing strategies, and the specific price points and structures applicable to CDW's customers and contracts; (c) OEM and vendor information, including CDW's arrangements with preferred OEM partners, negotiated discounts, incentive programs, vendor contacts,

procurement strategies, go-to-market strategies, commercial terms, and the confidential details of CDW's strategic partnerships with OEM and technology partners; (d) business development and sales strategies, including CDW's competitive positioning, sales methodologies, growth initiatives, marketing strategies, proposal development approaches, and strategies for pursuing and securing federal procurement opportunities, including strategies related to RFIs, RFPs, and other acquisition vehicles; (e) technology roadmaps and solution architectures, including CDW's proprietary approaches to designing, positioning, and delivering highly customized enterprise IT solutions, solution architectures, implementation strategies, customer technology environments, and technical roadmaps developed for CDW's federal and commercial customers; and (f) personnel information, including the identities, roles, responsibilities, customer assignments and relationships, specialties, expertise, achievements, performance capabilities, and compensation structures of CDW's workforce, including internal sales and commission metrics and processes.

32. The confidential information and trade secrets to which Individual Defendants were likewise exposed encompass data concerning CDW's customers' expenditure levels, purchasing habits, and behavioral patterns; customer budgeting processes and decision-making frameworks; strategic planning initiatives; competitive intelligence; technical sizing and capacity-planning assessments; gap analyses addressing technology needs and suitability for various upgrades, renewals, or infrastructure and architecture designs; and customer preferences, along with historical challenges and pain points. Frequently, combinations of these analyses and data points are consolidated or cultivated over time to generate CDW-specific, customer-tailored confidential information and trade secrets.

33. CDW's confidential information and trade secrets are commonly accumulated or developed over extended periods of engagement with customers, including recurring meetings aimed at understanding their evolving needs and engineering tailored solutions. Such customer engagements routinely necessitate the disclosure of non-public or proprietary information and involve the evaluation and analytical work of CDW's technical personnel and solution architects to produce bespoke, customized deliverables.

34. CDW's confidential information and trade secrets were generated through substantial commitments of time, resources, and capital expenditure. They are routinely produced as the outcome of coordinated effort among CDW's personnel working in concert, and they derive independent economic value from the secrecy in which they are maintained.

35. CDW actively safeguards the secrecy of its confidential information and trade secrets because, among other considerations, client requirements, contractual renewal cycles, pricing structures, and technology focus and innovation trajectories constitute mission-critical intelligence that materially affects CDW's revenues, operating margins, customer relationships, and service capabilities over extended time horizons.

36. CDW's confidential information and trade secrets are not only indispensable for cultivating, sustaining, and servicing CDW's customer base, but are equally central to CDW's enterprise-wide national planning, corporate strategy, workforce development, revenue generation, and financial forecasting functions.

37. CDW's confidential information and trade secrets, including customer proposals and recommendations, process evaluations, and proprietary system-design solutions, are developed and furnished to CDW personnel and customers subject to confidentiality protections. Likewise, internal CDW projections, client rosters, prospective business

opportunities, profit and margin data, strategic plans, staffing decisions, transition planning, competitive intelligence, and strategies with vendors and partners are disseminated among select CDW employees solely on the basis of protections CDW has instituted, such employee's confidentiality obligations owed to CDW, other applicable employment covenants such as duties of loyalty, and all governing trade secret laws.

38. CDW's confidential information and trade secrets, including long-range strategic plans and CDW's industry-leading technical expertise and solution methodologies, are regularly produced through the coordinated efforts of CDW employees who contribute to their development with the reasonable expectation that such information will be shielded by confidentiality protections and trade secret law.

**II. Hogan's Employment with CDW.**

39. CDW hired Hogan in 2016 as a Public Advanced Technology Account Executive. During his tenure with CDW, Hogan worked his way to become a Client Executive for a key CDW government subcontract.

40. As a Client Executive, Hogan served in a client-facing role on one of CDW's largest federal IT support contracts. Hogan was responsible for managing customer relationships, understanding agency technology needs, and coordinating the delivery of IT products, services, and solutions. Hogan's responsibilities included identifying customer requirements, developing technology solutions, collaborating with technical teams and vendor partners, overseeing contract-related sales opportunities, and ensuring successful implementation of enterprise IT solutions.

41. Hogan served as a liaison between customers and CDW to support technology initiatives. Hogan was a strategic contributor whose responsibilities extended beyond routine sales functions. He played a significant role in developing CDW's marketing and sales strategies,

helping to shape the roadmaps that guided CDW's growth, competitive positioning, and customer acquisition efforts. Hogan also worked closely with CDW leadership to develop and refine CDW's pricing structures, giving him detailed knowledge of CDW's pricing methodology, competitive considerations, margins, and overall business strategy. In addition, Hogan prepared customized proposals for prospective and existing clients, drawing upon his intimate knowledge of CDW's pricing models, negotiation strategies, customer preferences, and business objectives to tailor offerings to each client's particular needs. Through these responsibilities, Hogan acquired extensive knowledge of CDW's confidential and proprietary commercial strategies, including how CDW prices its products and services, positions itself against competitors, and approaches customer relationships.

42. Hogan also had access to highly sensitive, non-public information regarding CDW's top-performing personnel, including their roles and responsibilities, customer assignments and relationships, compensation and incentive structures, and the contractual obligations governing their employment.

43. Further, CDW entrusted Hogan with developing, maintaining, and strengthening CDW's relationships with key OEMs. He invested significant CDW time fostering those relationships on behalf of CDW, learning each OEM's product portfolio, technologies, programs, pricing models, and strategic initiatives inside and out so that he could identify the best solutions for customers and negotiate the most favorable pricing and commercial terms for CDW. As a result, Hogan became intimately familiar with CDW's preferred OEM partners, negotiated discounts, incentive programs, procurement strategies, and vendor contacts.

## III. Hogan Created and Continues to Grow Mojave, a Direct Competitor of CDW.

44. While still employed by CDW, in or around 2025, Hogan hatched a scheme to

compete against CDW and steal CDW's employees, customers, and trade secrets.

45. As part of that plan, on October 24, 2025, Hogan incorporated Mojave in the state of California as a business.

46. Like CDW, Mojave operates as a technology solutions provider that delivers end-to-end IT products and services to commercial and government customers. Mojave offers the same core solutions that define CDW's business, including enterprise hardware procurement, software licensing, cloud infrastructure and migration services, cybersecurity solutions, managed IT services, and artificial intelligence implementation and consulting. Mojave also positions itself as a value-added reseller that not only procures technology products, but also designs, implements, and supports comprehensive technology solutions tailored to its customers' needs. In addition, both companies serve federal agencies and other regulated organizations, emphasizing secure, compliant technology environments and digital transformation initiatives. Mojave's core business offerings directly overlap with those provided by CDW, and the companies directly compete for the same customers and technology projects.

47. Despite commencing a directly competitive business while still employed by CDW, Hogan took no steps to cordon off his CDW work from his Mojave plans.

48. On October 23, 2025, the day before Hogan incorporated Mojave, Hogan drafted an email from his CDW email account referencing Mojave email domains and his labor law attorney. Subsequent to learning this, CDW initiated a forensic examination into certain of Individual Defendants' respective CDW devices. Its examination remains ongoing.

49. Moreover, while still employed at CDW, Hogan and Mojave worked to recruit at least one CDW employee to join Mojave: Harrington.

50. Harrington was an Illinois-based employee with over twenty-five (25) years of

experience working for CDW. At the time of his voluntary separation, Harrington served as an Account Manager with CDW's government segment.

51. As an Account Manager, Harrington served as one of the primary points of contact for key federal customers. In that role, CDW invested in Harrington to develop and maintain long-term relationships with customers, gain an in-depth understanding of their operational and technology needs, and recommend and sell tailored, cost-effective IT solutions designed to improve performance and achieve mission objectives. Harrington coordinated with internal technical, engineering, and service delivery teams to align proposed solutions with customer requirements, managed customer accounts throughout the sales and implementation lifecycle, and worked to expand existing business opportunities. Through these responsibilities, Harrington gained extensive knowledge of customer priorities, technology strategies, procurement plans, pricing, and solution offerings related to CDW's government segment.

52. Harrington also worked closely with strategic OEMs and technology partners, fostering relationships on behalf of CDW, developing an in-depth understanding of their products, programs, and service offerings, and leveraging those relationships to identify new business opportunities and secure favorable pricing and commercial terms for CDW. Through these efforts, Harrington became familiar with CDW's preferred business partners, sourcing strategies, and commercially sensitive information regarding vendor programs, pricing, and go-to-market strategies.

53. On December 18, 2025, Hogan provided CDW notice of his resignation. On December 31, 2025, Hogan separated his employment from CDW to run Mojave full time. At the time, Hogan did not notify CDW that he had founded Mojave and/or was leaving CDW to run Mojave full time.

54. At the time of his resignation, Hogan's compensation from CDW in 2025 totaled approximately $1.5 million, in addition to other employment benefits.

55. Without any legitimate business reason, following his resignation, Hogan knowingly retained and took with him CDW's confidential and trade secret information, including internal emails and pricing information, proprietary compilations of certain information, and his extensive personal knowledge of the same.

56. Similarly, on December 30, 2025, Harrington provided CDW notice of his resignation. On December 31, 2025, Harrington separated his employment from CDW to work at Mojave full time. At the time, Harrington did not notify CDW that he was leaving CDW to join Hogan at Mojave.

57. At the time of his resignation, Harrington's compensation from CDW in 2025 totaled over $200,000, in addition to other employment benefits.

58. Hogan and Mojave recruited at least three other CDW employees: Kelley Dobner, an Illinois-based Business Development Manager who had subject matter expertise in CDW's federal practice, particularly military contracts; Bill Watton, a California-based Senior Client Executive with extensive knowledge of CDW's Navy business; and Jason Reindel, a California-based Transformation Center Infrastructure Architect.

59. Upon information and belief, Harrington helped Hogan and Mojave recruit and induce Dobner to leave her employment with CDW and join Mojave while Harrington and Hogan were each still employed by CDW.

60. Dobner had worked for CDW for approximately fifteen (15) years when she provided CDW her notice of resignation in April 2026. Subsequently, she began working for Mojave as the Director of Order Management Operations.

61. In her role as a Business Development Manager at CDW, Dobner was responsible for driving business growth and expanding CDW's presence within a designated region supporting one of the largest enterprise IT services programs for the United States Navy and Marine Corps. Dobner served as a primary point of contact for customers, strategic business partners, and OEMs, cultivating long-term relationships and identifying opportunities to deliver technology solutions aligned with customer needs and CDW's objectives. Dobner collaborated with management to develop and implement regional sales strategies, worked closely with the dedicated sales team to enhance its effectiveness and increase revenue, and established and maintained mutually beneficial relationships with industry partners whose offerings complemented CDW's business strategy. Through these responsibilities, Dobner gained extensive knowledge of CDW's sales strategies, customer relationships, OEM relationships, business development initiatives, partnership strategy, pricing methodologies, and growth opportunities, as well as confidential information concerning prospective customers, ongoing business opportunities, and competitive positioning.

62. Dobner's compensation from CDW in 2025 totaled over $180,000, in addition to other employment benefits.

63. Watton had worked for CDW for over 7 years when he provided CDW his notice of resignation in April 2026. Subsequently, he began working for Mojave as the Director of Engineering.

64. In his role as a Senior Client Executive at CDW, Watton served as a trusted advisor to some of CDW's most significant government customers, driving strategic growth through the development and delivery of complex, enterprise-level technology solutions and services. Watton maintained responsibility for an annual portfolio exceeding $85 million, with accountability for both revenue growth and profitability, and consistently exceeded performance objectives. Watton

led cross-functional teams of sales, technical, engineering, and operations personnel to develop, propose, and implement mission-critical technology solutions for the Department of the Navy and other defense customers. In that role, Watton worked directly with executive stakeholders, solution architects, and OEM partners to understand customer priorities, develop long-term technology roadmaps, and tailor sophisticated, AI-driven and other advanced technology solutions to meet evolving customer requirements. Watton also played a key role in shaping responses to highly competitive procurement opportunities, including RFIs, RFPs, and other acquisition vehicles, by aligning CDW's technical capabilities, pricing strategies, and service offerings with customer needs. Additionally, Watton established and led CDW's Navy Innovation Center in San Diego, fostering collaboration among customers, OEMs, and internal stakeholders to accelerate the evaluation and adoption of emerging technologies. Through these responsibilities, Watton acquired extensive knowledge of CDW's strategic growth initiatives, customer relationships, sales methodologies, pricing strategies, proposal development, technology roadmaps, OEM partnerships, competitive positioning, and other confidential and proprietary business information that provides CDW with a substantial competitive advantage.

65. Watton's compensation from CDW in 2025 totaled over $350,000, in addition to other employment benefits.

66. According to his LinkedIn profile[1], in his new role as Director of Engineering, Watton partners directly with Hogan to develop and execute corporate strategy, allocate technical resources, and oversee operational initiatives for the rapidly expanding business. Watton is responsible for directing advanced infrastructure initiatives and leading Mojave's cybersecurity and compliance strategy; managing strategic relationships with major OEM partners to expand

[1] William Watton, LinkedIn (profile page), https://www.linkedin.com/in/williamwatton/ (last visited Aug. 14, 2026).

certifications, partnerships, and revenue opportunities; and leading business development, capture efforts, and strategic partnerships to secure new customers and deliver comprehensive technical solutions.

67. Reindel had worked for CDW for approximately two (2) years when he provided CDW his notice of resignation in July 2026. Subsequently, he began working for Mojave as the Principal Data Center Systems Engineer.

68. In his role as a Transformation Center Infrastructure Architect, Reindel was responsible for designing, architecting, and implementing sophisticated enterprise technology solutions supporting CDW's customers, such as for the Department of the Navy and other government organizations. Reindel worked directly with customers, technical stakeholders, and cross-functional internal teams to evaluate customer requirements, develop enterprise technology roadmaps, and architect customized infrastructure, networking, cloud, virtualization, cybersecurity, and data center solutions tailored to each customer's operational needs. Reindel led the design and delivery of proof-of-concept environments, developed resilient enterprise architectures, oversaw large-scale infrastructure modernization initiatives, and engineered advanced solutions involving software-defined data centers, Zero Trust architectures, virtual desktop infrastructure, enterprise governance platforms, and automated IT service management. Reindel also directed infrastructure planning and capacity modeling for significant data center expansion projects and managed mission-critical virtualized environments to ensure high availability and operational continuity. Through these responsibilities, Reindel gained intimate knowledge of CDW's technical solution offerings, architecture methodologies, implementation strategies, customer technology environments, strategic roadmaps, OEM technologies and relationships, and proprietary approaches to designing and delivering enterprise solutions, as well

as confidential information concerning customer requirements, solution designs, pricing considerations, and competitive technical strategies that provide CDW with a substantial competitive advantage. Because Reindel served as the principal technical architect for complex enterprise engagements, he possesses detailed knowledge of customers' existing infrastructure, future technology initiatives, security requirements, budgetary constraints, and procurement plans, as well as CDW's proprietary methodologies for designing, positioning, and delivering highly customized enterprise solutions. This information is confidential, commercially valuable, and would provide a competitor with a significant advantage if disclosed or used.

69. Reindel's compensation from CDW in 2025 totaled over $210,000, in addition to other employment benefits.

70. Hogan, Harrington, Dobner, Watton, and Reindel each possess specialized knowledge of, among other things, CDW's contract strategies, customer relationships, OEM relationships, pricing structures, and proprietary value propositions critical to future contract pursuits.

71. Upon information and belief, Mojave began operating in or around late 2025 and early 2026; however, it did not go publicly "live" until June 24, 2026, when it announced its business and website on LinkedIn[2].

72. Mojave would not be able to begin operations in such a short and accelerated period of time without improperly using CDW's confidential and trade secret information and leveraging Individual Defendants' knowledge of the same.

73. Moreover, Mojave's ability to commence its operations so quickly could not have

---

[2] Mojave Advanced Solutions, Mojave Solutions: AI-Forward IT Solutions, LinkedIn (post), https://www.linkedin.com/posts/mojave-advanced-solutions_mojave-solutions-ai-forward-it-solutions-activity-7475665591413022720-WhNz (last visited Aug. 14, 2026).

been possible absent considerable work during the period in which Hogan was still employed by CDW and without the OEM relationships Hogan, Harrington, Dobner, and Watton maintained on CDW's behalf. By investing substantial time, resources, and goodwill in developing those strategic partnerships on behalf of CDW, Hogan, Harrington, Dobner, and Watton were enabled to immediately engage key OEMs and secure the products, support, and commercial terms necessary to launch operations successfully. In particular, Mojave would not be able to operate without OEM and SDVOSB certifications, which require months, if not years, worth of investment and work to obtain. Instead, Mojave was able to jump the line by relying on the OEM relationships CDW built through Hogan, Harrington, Dobner, and Watton.

## IV. Harrington & Dobner Are Subject to Valid and Enforceable Restrictive Covenants.

74. On January 14, 2004, Harrington signed a Confidentiality and Non-Solicitation Agreement (the "Harrington Agreement"). The Harrington Agreement is governed by Illinois law.

75. Pursuant to the Harrington Agreement, Harrington agreed to the following non-solicitation obligations:

> 3. Non-Solicitation. You acknowledge that the Company's relationships with its customers are important for the continued success of the Company. To protect these relationships, you agree that for a period of three (3) months after your employment with the Company terminates for any reason, you will not on behalf of any of the Company's competitors (including, without limitation, any organization or entity that you may start or become affiliated with) directly or indirectly solicit or otherwise contact in any way any customer or prospective customer of the Company with which you had contact while employed by the Company. For purposes of this Agreement, "prospective customer" includes any person, corporation, or other entity with respect to whom, at any time during the one-year period before the termination of your employment with the Company for any reason, you submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, acquired or had access to any Confidential Information or had contact as a result of your employment with the Company.
>
> You also acknowledge that the Company has a highly qualified work force and strong interest in maintaining the stability of that work force and agree that for a period of three (3) months after your employment with the Company terminates for

> any reason, you will not contact any employees of the Company for the purpose of soliciting or inducing them to terminate their employment with the Company.

Exhibit ("Ex.") A, p. 2.

76. Harrington further agreed to notify CDW of his employment with any competitive organization. *See id.*, p. 2.

77. Harrington also acknowledged that, in the event of a breach of the Harrington Agreement, CDW would be entitled to seek injunctive relief. *See id.*

78. In exchange for agreeing to the covenants contained in the Harrington Agreement, CDW provided Harrington access to its trade secrets and Confidential Information (as defined therein), continued employment, salary, and benefits.

79. On June 7, 2011, Dobner signed a Confidentiality and Non-Solicitation Agreement (the "Dobner Agreement"). The Dobner Agreement is governed by Illinois law.

80. Pursuant to the Dobner Agreement, Dobner agreed to the following non-solicitation obligations:

> 2. Non-Solicitation. You acknowledge that the Company's relationships with its customers are important for the continued success of the Company and that the Company expends substantial resources in developing and maintaining its customer relationships. To protect these relationships, you agree that both during your employment and for a period of six (6) months after your employment with the Company terminates for any reason, you will not on behalf of any of the Company's competitors or customers (including, without limitation, any organization or entity that you may start or become affiliated with), sell products to, provide services to, or directly or indirectly through another person, entity or otherwise, solicit, communicate with or otherwise have contact with any customer or prospective customer of the Company with which you had contact while employed by the Company concerning or for the purpose of directly or indirectly selling products or providing services or otherwise interfering or interrupting the Company's relationship with that customer or prospective customer. For purposes of this Agreement, "prospective customer" includes any person, corporation, or other entity with respect to whom, at any time during the one-year period before the termination of your employment with the Company for any reason, you submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, acquired or had access to any Confidential Information or had

> contact with as a result of your employment with the Company.
>
> You also acknowledge that the Company has a highly qualified workforce, expends substantial resources in developing and maintaining that workforce, and has a strong interest in maintaining that workforce. You further agree that during your employment and for a period of six (6) months after your employment with the Company terminates for any reason, you will not directly or indirectly through any other person and/or entity recruit, solicit, induce, contact or participate in communicating with any employee of the Company about leaving the employment of the Company or otherwise interfere with the employee's relationship or work for the Company, regardless of who initiated the contact. You further agree that both during your employment and for a period of six (6) months after your employment with the Company terminates for any reason, you will not directly or indirectly on behalf of any of the Company's competitors hire or otherwise offer employment to any employee of the Company, regardless of who initiated the contact.

Ex. B, pp. 1-2.

81. Dobner also agreed to notify CDW of her employment with any competitive organization. *See id.* at p. 2.

82. Dobner further acknowledged that, in the event of a breach of the Dobner Agreement, CDW would be entitled to seek injunctive relief. *See id.* Additionally, she agreed CDW would be entitled to attorneys' fees and costs in any successful legal proceeding regarding the Dobner Agreement. *See id.*

83. In exchange for agreeing to the covenants contained in the Dobner Agreement, CDW provided Dobner access to its trade secrets and Confidential Information (as defined therein), continued employment, salary, and benefits.

## V. CDW Protects Its Confidential and Trade Secret Information.

84. CDW protects all confidential and trade secret information through a comprehensive, multi-layered approach.

85. CDW protects its confidential and trade secret information by, among other things, requiring certain of its employees to agree to contractual confidentiality obligations.

86. Upon information and belief, Hogan, Harrington, Dobner, Watton, and Reindel each agreed to contractual confidentiality requirements.

87. In particular, the Harrington Agreement states:

> 1. Protection of The Company's Confidential Information. You agree that unless you first obtain the Company's written consent, you will not disclose or use at any time, either during or after your employment by the Company, any Confidential Information, except to the extent such disclosure or use is required in the performance of your duties for the Company. You further agree to take all appropriate steps to safeguard Confidential Information and to protect it against disclosure or misuse. You also agree that if you leave the Company's employ for any reason, you will immediately return to the Company all written or recorded material (in any format whatsoever, including computerized) obtained through your employment including, but not limited to, customer lists, correspondence, files, records, or any other document or record containing Confidential Information. You agree and acknowledge that the provisions of this paragraph apply to the Company's Confidential Information, as well as any of our vendors' or customers' Confidential Information of which you become aware as a result of your employment with the Company.

Ex. A, p. 1.

88. The Harrington Agreement defines Confidential Information as:

> [I]nformation relating to the present or planned business of the Company, our vendors and our customers that has not been released publicly by authorized representatives of the Company. This information may include, for example, trade secrets, know-how, inventions, patents and trademarks, copyrights, business development, marketing and sales programs, purchasing manners and methods, the identity and addresses of actual or potential customers, customer and supplier/vendor information, personnel information, compensation information, pricing information, financial data, regulatory approval strategies, results of investigations, research, testing methodologies and results, certain computer programs, manufacturing methods and processes, technologies and protocols, product development strategies and processes, safety information, programs and protocols, product design and related items used by the Company in its business. It is your duty and obligation to preserve and protect such Confidential Information both during and after your employment by the Company.

*Id.*

89. The Dobner Agreement states:

> 1. Protection of The Company's Confidential Information. You acknowledge and

> agree that (i) the Confidential Information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (ii) the Confidential Information is, and has been, subject to efforts by CDW to maintain its secrecy that are reasonable under the circumstances. You agree that unless you first obtain the Company's written consent, you will not disclose or use at any time, either during or after your employment by the Company, any Confidential Information, except to the extent such disclosure or use is required in the performance of your duties for the Company. You further agree to take all appropriate steps to safeguard Confidential Information and to protect it against disclosure or misuse. You also agree that if you leave the Company's employ for any reason, you will immediately return to the Company all written or recorded material (in any format whatsoever, including computerized) obtained through your employment including, but not limited to, customer lists, correspondence, files, records, or any other document or record containing Confidential Information. You agree and acknowledge that the provisions of this paragraph apply to the Company's Confidential Information, as well as any of our vendors' or customers' Confidential Information of which you become aware as a result of your employment with the Company.

Ex. B, p. 1.

90. The Dobner Agreement defines Confidential Information as:

> [I]nformation relating to the present or planned business of the Company, our vendors and our customers that has not been released publicly by authorized representatives of the Company. This information may include, for example, trade secrets, know-how, inventions, patents and trademarks, copyrights, business development, marketing and sales programs, purchasing manners and methods, the identity and addresses of actual or potential customers, customer and supplier/vendor information, personnel information, compensation information, training programs and materials, pricing information, financial data, regulatory approval strategies, results of investigations, research, testing methodologies and results, certain computer programs, manufacturing methods and processes, technologies and protocols, product development strategies and processes, safety information, programs and protocols, product design and related items used by the Company in its business. It is your duty and obligation to preserve and protect such Confidential Information both during and after your employment by the Company.

*Id.*

91. CDW also protects its confidential and trade secret information by enforcing policies across its workforce requiring all employees to protect CDW's trade secret and confidential information.

92. CDW maintains a "Global Information Security Policy & Standards" and a "Protect Confidential Information" policy, which states, in part:

> You are responsible for protecting our Company's confidential information and intellectual property, as well as the confidential information and intellectual property of our business partners. . . . Confidential information includes all information that has not been made available to the public. This includes any information about CDW, its suppliers, its customers or our coworkers that has not been generally disclosed and might be harmful to them, or useful to competitors, if disclosed. Such information includes, among other things, revenue and profit figures, financial reports, new product plans, marketing strategies, information relating to internal operations, future business plans and potential acquisitions, divestitures and investments.

93. On an annual basis, Hogan, Harrington, Dobner, Watton, and Reindel underwent training regarding the protection of CDW's confidential information, reviewed CDW's policies regarding the same, and certified their understanding and agreement with those policies.

94. Access to confidential and trade secret information is also strictly limited to those with a legitimate need to know, and coworkers are expected to share such information only on that need to know basis and not under any other circumstances.

95. All computers and sensitive documents are required to be password protected, and devices such as notebooks, tablets, and smartphones are secured against theft or unauthorized access. CDW also requires any papers containing confidential information to be secured in a desk or cabinet whenever an employee leaves his or her workstation.

96. Additionally, CDW prohibits transmission of certain confidential and trade secret information via email or instant message unless encrypted.

97. Moreover, all computers connected to CDW's information systems, whether personally owned or company-owned, maintain up-to-date, anti-virus software installed to safeguard the integrity of CDW's systems and the confidential and trade secret information they contain.

98. In certain of CDW's divisions, particularly those related to military contracts on which

Individual Defendants worked, heightened security measures are enforced, including but not limited to multi-factor (dual) authentication, role-based access restrictions, encryption, audit logging, and additional security measures required by specific governmental customers.

## VI. Hogan and Mojave Misuse CDW Resources.

99. CDW's forensic examination of the equipment Individual Defendants used while purportedly working on behalf of CDW in search of evidence related to the claims in this matter continues.

100. Hogan used CDW equipment to work on behalf of Mojave while employed at CDW. Upon information and belief, Hogan used CDW equipment to steal CDW's confidential information and trade secrets and to tortiously interfere with CDW's business and employment relationships.

101. CDW has attempted to inventory various computer equipment from its office in San Diego at which Reindel, Hogan, and Harrington previously worked.

102. CDW has been unable to locate various computer equipment from its office in San Diego at which Reindel, Hogan, and Harrington previously worked which are missing without any explanation or justification ("the San Diego Equipment").

103. On information and belief, some or all Defendants are utilizing the San Diego Equipment for the benefit of Mojave or otherwise improperly disposed of the San Diego Equipment to the detriment of CDW.

## VII. Mojave, Hogan, and Harrington Improperly Diverted a CDW Contract and Defendants Continue to Improperly Interfere with CDW's Current and Future Business Relationships.

104. Immediately following Hogan's and Harrington's separation from CDW to run Mojave, one of the partners with whom CDW serves as a subcontractor for the Navy Group (the

"Navy Contract A") informed CDW that instead of continuing to use CDW as a subcontractor as it had been doing, the partner was instead going to put the subcontract out to bid.

105. When a contract is "put out to bid," it means that the customer is searching for a new entity to fulfill the contract.

106. The Navy Contract A had been with CDW for several years and is worth millions annually. Based on CDW's history with Navy Contract A and CDW's investment in building a relationship with the customer of the Navy Contract A, CDW had a reasonable expectation that the Navy Contract A would be continued with CDW.

107. While at CDW, Harrington was the main point of contact for the customer of the Navy Contract A and directly serviced the Navy Contract A for several years on behalf of CDW as its account manager. CDW directly invested in Harrington to build a relationship with the customer of the Navy Contract A on behalf of CDW.

108. Upon information and belief, Mojave, Hogan, and Harrington, while Hogan and Harrington were employed by CDW and continuing after, relied upon Hogan and Harrington's knowledge of confidential and trade secret information regarding the Navy Contract A and customer, including but not limited to price points and structures, pain points, negative information, needs, terms of agreement and negotiation with CDW, and preferences, as well as Harrington's intimate familiarity with CDW's relationship with the Navy Contract A and customer to ensure that the Navy Contract A would not be renewed with CDW to the benefit of Mojave.

109. Notably, upon information and belief, the Navy Contract A has already been or will soon be awarded to Mojave.

110. Upon information and belief, Mojave, Hogan, Harrington, and Watton, all while employed by CDW and continuing after, relied and now continue to rely upon Hogan, Harrington,

and Watton's knowledge of confidential and trade secret information regarding CDW government contracts, suppliers, and customers, such as the Navy Contract A, including but not limited to price points and structures, pain points, negative information, needs, terms of agreement and negotiation with CDW, and preferences, with the intention of interfering with those relationships, contracts, and prospective business advantages and expectancies to the detriment of CDW and benefit of Mojave.

111. Mojave wrongfully acquired and obtained CDW's confidential information and trade secrets during the course of recruiting Individual Defendants and while those individuals remained active CDW employees. Mojave, both directly and indirectly, reached out to CDW customers, vendors, and employees by leveraging CDW's confidential information and trade secrets in order to solicit their business or employment - or to gather further confidential information and trade secrets. Mojave subsequently continued to unlawfully exploit and utilize CDW's confidential information and trade secrets once Individual Defendants came aboard at Mojave, and continues to do so.

112. Upon information and belief, as a result of the activities of Mojave, Hogan, Harrington, and Watton, CDW's current and future business expectancies with both customers and suppliers have suffered and CDW has suffered and continues to suffer damages as a result, including but not limited to the loss of the Navy Contract A.

113. Numerous CDW customers with whom Individual Defendants were involved have contracts that are either expiring or approaching renewal in the near term, meaning the full scope of harm caused to CDW by Mojave and Individual Defendants' scheme has yet to be fully realized.

114. CDW has encountered unfair competition from Mojave that was entirely absent prior to Individual Defendants' departures from CDW.

115. As a direct and proximate result of the foregoing, CDW has suffered injury and damages through, among other things, unfair and unlawful competition, lost deals, lost contracts, lost opportunities, and lost registrations, resulting not only in diminished revenue and profits, but also significant harm to its reputation.

116. Upon information and belief, Mojave and Individual Defendants have, in contrast, derived substantial profits and have been unjustly enriched as a consequence of their unlawful conduct.

117. Mojave and Individual Defendants have misappropriated and misused CDW's confidential information and trade secrets, and will continue to do so absent intervention by this Court.

## COUNT I
## Tortious Interference With Business Relationship and Expectancy
## (Damages and Injunctive Relief)
## Against All Defendants

118. CDW realleges and incorporates by reference Paragraphs 1 through 117 as though fully set forth herein.

119. While employed by CDW, Hogan commenced a competing business, Mojave.

120. Hogan resigned from CDW to operate Mojave full time.

121. Harrington resigned from CDW to help Hogan run and to acquire business on behalf of Mojave.

122. Watton resigned from CDW to help Hogan run and to acquire business on behalf of Mojave.

123. CDW had a valid contractual relationship and business expectancy as it relates to the Navy Contract A and customer.

124. The Navy Contract A was worth millions annually to CDW.

125. As the main point of contact and account manager for the Navy Contract A and customer while at CDW, Harrington has direct knowledge of the Navy Contract A, customer, and related obligations, as well as, among other things, customer needs, wants, preferences, and pain points.

126. Upon information and belief, Hogan also had knowledge of the Navy Contract A, customer, and related obligations through Hogan's senior customer-facing and customer-centered role as a Client Executive at CDW as well as Harrington's disclosure of the same.

127. Mojave, through Hogan and Harrington, also had knowledge of the Navy Contract A, customer, and related obligations through Hogan's senior customer-facing and/or customer-centered role as a Client Executive at CDW as well as Harrington's disclosure of the same.

128. The Harrington Agreement prohibited Harrington from soliciting CDW's customers, such as the Navy Contract A and customer, for three (3) months after Harrington's employment with CDW ended.

129. Upon information and belief, Mojave, through Hogan, and Hogan were aware of Harrington's contractual obligations owed to CDW, including his obligation not to solicit CDW's customers for a period of three (3) months after his employment with CDW terminated.

130. Mojave, Hogan, and Harrington knew that inducing the Navy Contract A to not renew with CDW would cause significant harm to CDW.

131. Mojave, Hogan, and Harrington nevertheless intentionally interfered with the contractual relationship and business expectancy between CDW, the Navy Contract A, and customer by inducing the customer to not renew the Navy Contract A with CDW and place the Navy Contract A out to bid to the benefit of Mojave and detriment of CDW.

132. Upon information and belief, Mojave, Hogan, and Harrington, wrongfully relied on Hogan's and Harrington's knowledge of confidential and trade secret information regarding the Navy Contract A, including but not limited to price points and structures, pain points, negative information, needs, terms of agreement and negotiation with CDW, and preferences, as well as Harrington's intimate familiarity with CDW's relationship with the Navy Contract A and customer to induce the customer to not renew the Navy Contract A with CDW and place the Navy Contract A out to bid to the benefit of Mojave and detriment of CDW.

133. Mojave, Hogan and Harrington's actions were also wrongful as they began while Hogan and Harrington were still employed by CDW.

134. Mojave's, Hogan's, and Harrington's actions were improper, unjustified, malicious, and in reckless disregard for CDW's rights because they willfully violated the Harrington Agreement, and used CDW's relationship with the Navy Contract A and customer, their knowledge of that relationship, and their knowledge of confidential and trade secret information regarding the Navy Contract A, customer, and relationship with CDW to induce the Navy Contract A and customer to not renew the Navy Contract A with CDW, place the Navy Contract A out to bid and, subsequently, award the contract to Mojave. This inducement was in furtherance of Mojave's plan to unfairly compete with CDW by poaching CDW's customers and expanding Mojave's business.

135. CDW has valid contractual relationships, business expectancies, and prospective business advantages and expectancies with its government suppliers and customers.

136. Hogan, Harrington, Watton, and Dobner, as well as Mojave through Hogan, Harrington, Watton, and Dobner, are each aware of CDW's valid contractual relationships,

business expectancies, and prospective business advantages and expectancies with its government suppliers and customers.

137. Upon information and belief, Mojave, Hogan, Harrington, Watton, and Dobner nevertheless intentionally interfered with contractual relationships, business expectancies, and prospective business advantages and expectancies with CDW's government suppliers and customers.

138. Upon information and belief, Mojave, Hogan, Harrington, Watton, and Dobner wrongfully relied on Hogan's, Harrington's, Watton's, and Dobner's knowledge of confidential and trade secret information regarding CDW's government suppliers and customers, including but not limited to price points and structures, pain points, negative information, needs, terms of agreement and negotiation with CDW, and preferences with the purpose and effect of interfering with CDW's relationships, agreements, and future prospects with such customers and suppliers to the benefit of Mojave and detriment of CDW.

139. Mojave's, Hogan's, Harrington's, Watton's, and Dobner's actions were improper, unjustified, malicious, and in reckless disregard for CDW's rights because they willfully violated the Harrington Agreement and the Dobner Agreement, and used CDW's relationships with the government customers and suppliers, their knowledge of those relationships, and their knowledge of confidential and trade secret information regarding the government customers and suppliers and their relationships with CDW with the purpose and effect of interfering with CDW's relationships, agreements, and future prospects with such customers and suppliers to the benefit of Mojave and detriment of CDW. This was in furtherance of Mojave's plan to unfairly compete with CDW by poaching CDW's customers and expanding Mojave's business.

140. Mojave's, Hogan's, Harrington's, and Watton's actions were also wrongful as they began while Hogan, Harrington, and Watton were still employed by CDW.

141. CDW has suffered and will continue to suffer damages and irreparable harm as a direct result of Mojave's, Hogan's, Harrington's, Watton's, and Dobner's tortious interference with contractual relations and prospective business advantages and expectancies, including but not limited to lost revenue from contract non-renewals, lost business opportunities, harm to its goodwill, reputation, and competitive marketplace standing, and loss of its customer relationship and investments.

**COUNT II**
**Tortious Interference With Employment and Contractual Relationships**
**(Damages)**
**Against Mojave, Hogan, and Harrington**

142. CDW realleges and incorporates by reference Paragraphs 1 through 141 as though fully set forth herein.

143. Mojave and Hogan, while still employed by CDW, recruited Harrington to end his employment with CDW to join Mojave.

144. Similarly, Mojave and Hogan recruited Dobner, Watton, and Reindel to terminate their respective employments with CDW to join Mojave.

145. Upon information and belief, Harrington assisted Mojave and Hogan in soliciting and inducing Dobner to terminate her employment with CDW to join Mojave.

146. Mojave and Hogan relied upon Hogan's insider knowledge to identify the highest-value employee targets – specifically, those with critical knowledge and customer relationships whose departure would directly impair CDW's ability to renew its current contracts and win future contracts and advance Mojave's business.

147. At all relevant times, CDW had valid and existing employment relationships with Harrington, Dobner, Watton, and Reindel (collectively, the "Recruited Employees"), each of whom was employed by CDW on an at-will basis pursuant to established terms and conditions of employment recognized and protected under applicable law.

148. Mojave, through Hogan, and Hogan had actual knowledge of CDW's employment relationships with the Recruited Employees, as Hogan's senior role with CDW granted him access to non-public information regarding CDW's top-performing personnel, including their roles and responsibilities, customer assignments and relationships, compensation and incentive structures, and the contractual obligations governing their employment.

149. Hogan identified the Recruited Employees as high-value targets based on his insider knowledge.

150. The Harrington Agreement prohibited Harrington from soliciting or encouraging CDW's employees to leave CDW for three (3) months after Harrington's employment with CDW ended.

151. Mojave and Hogan acted intentionally, willfully, and without justification in soliciting, inducing, and encouraging the Recruited Employees to terminate their employment with CDW, with the specific intent to deprive CDW of their services and to exploit their knowledge, skills, and relationships for Mojave's competitive benefit.

152. Harrington acted intentionally, willfully, and without justification in soliciting, inducing, and encouraging Dobner to terminate her employment with CDW, with the specific intent to deprive CDW of her services and to exploit her knowledge, skills, and relationships for Mojave's competitive benefit.

153. The solicitation of the Recruited Employees was not the result of ordinary competitive recruitment activity but was instead a deliberate and coordinated scheme, carried out using CDW's own confidential and proprietary information, and in violation of the Harrington Agreement, to systematically dismantle CDW's workforce and undermine its competitive position.

154. As a direct and proximate result of Mojave's, Hogan's, and Harrington's (as applicable) improper interference, the Recruited Employees terminated their employment with CDW and joined Mojave, causing CDW to lose the benefit of its employment relationships with those individuals.

155. The departure of the Recruited Employees, each of whom possessed critical operational knowledge, confidential client and OEM information, and/or established customer relationships, directly and foreseeably impaired CDW's ability to service existing accounts, renew current contracts, and compete for future business opportunities.

156. Mojave and Hogan also intentionally and unjustifiably interfered with the contractual and other obligations owed by the Recruited Employees to CDW by exploiting their knowledge of, and intimate familiarity with, CDW's confidential and trade secret information regarding its relationships with its OEM partners for the benefit of Mojave. Mojave and Hogan were well aware that the Recruited Employees were bound by confidentiality obligations requiring them to protect CDW's confidential information and prohibiting them from using or disclosing such information, particularly for the benefit of a competitor or any third party. Despite that knowledge, upon information and belief, Mojave and Hogan encouraged, directed, and/or knowingly accepted the use of Harrington's, Dobner's, Watton's, and Reindel's confidential knowledge concerning CDW's OEM relationships, including information regarding key personnel, business strategies, pricing and commercial practices, partner preferences, historical

dealings, and other non-public information developed through their respective employments with CDW.

157. By inducing or facilitating the use of information that the Recruited Employees were contractually and otherwise obligated to keep confidential, Mojave and Hogan intentionally caused their breach of those obligations. Mojave and Hogan's conduct enabled Mojave to capitalize on CDW's years of investment in cultivating valuable OEM relationships, thereby securing an accelerated head start by acquiring the requisite certifications at record pace and an unfair competitive advantage while depriving CDW of the benefit of its contractual confidentiality protections.

158. Additionally, Mojave and Hogan intentionally and without justification interfered with Harrington's contractual obligations to CDW by inducing Harrington to violate both his confidentiality and non-solicitation covenants as they pertain to the Navy Contract A and customer.

159. Mojave, through Hogan, and Hogan knew that Harrington was bound by the Harrington Agreement prohibiting him from using or disclosing CDW's confidential information and from soliciting CDW's customers on behalf of a competing business. Nevertheless, Mojave and Hogan encouraged, directed, and/or facilitated Harrington's efforts to solicit the Navy Contract A and customer to terminate its relationship with CDW and transition its business to Mojave. In doing so, Mojave and Hogan also induced Harrington to use and exploit confidential information acquired during his employment with CDW, including but not limited to knowledge of the customer's business needs, decision-makers, purchasing history, pricing, and relationship strategies, to enhance the effectiveness of the solicitation. Mojave and Hogan's actions were deliberate and designed to capitalize on Harrington's contractual relationship with CDW while

disregarding the contractual restrictions contained in the Harrington Agreement that protected CDW's customer relationships and confidential information. As a direct and proximate result of Mojave and Hogan's intentional interference, Harrington breached his contractual obligations to CDW, causing CDW to suffer substantial competitive and economic harm.

160. As a direct and proximate result of Mojave's, Hogan's, and Harrington's tortious interferences, CDW has suffered substantial damages, including but not limited to lost revenue from contract non-renewals, lost prospective business opportunities, costs associated with recruiting and training replacement personnel, harm to its goodwill, reputation, confidential and trade secret information, competitive advantage, and competitive marketplace standing, and loss of its customer relationship and investments.

## COUNT III
## Violation of the Defend Trade Secrets Act
## (Damages and Injunctive Relief)
## Against All Defendants

161. CDW realleges and incorporates by reference Paragraphs 1 through 160 as though fully set forth herein.

162. The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

163. Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored,

compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

164. Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

165. Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

166. CDW substantially invested time, resources, capital, and expertise toward developing confidential and trade secret information that is not publicly known, as well as

proprietary and valuable compilations of certain information. This confidential and trade secret information includes, without limitation:

a. Customer information, including but not limited to, the identities, needs, preferences, pain points, budgets, technology strategies, procurement plans, decision-makers, purchasing histories, and relationship strategies of CDW's federal and commercial customers, including those relating to Navy Contract A;

b. Pricing information, including but not limited to, CDW's pricing methodologies, cost structures, margin analyses, competitive pricing models, pricing strategies, and the specific price points and structures applicable to CDW's customers and contracts, including the Navy Contract A;

c. OEM and vendor information, including but not limited to, CDW's preferred OEM partners, negotiated discounts, incentive programs, vendor contacts, procurement strategies, go-to-market strategies, commercial terms, and the confidential details of CDW's strategic partnerships with OEM and technology partners, including those relevant to OEM and SDVOSB certifications;

d. Business development and sales strategies, including but not limited to, CDW's competitive positioning, sales methodologies, growth initiatives, marketing strategies, proposal development approaches, and strategies for pursuing and securing federal procurement opportunities, including strategies related to RFIs, RFPs, and other acquisition vehicles;

e. Technology roadmaps and solution architectures, including but not limited to, CDW's proprietary approaches to designing, positioning, and delivering highly customized enterprise IT solutions, including solution architectures,

implementation strategies, customer technology environments, and technical roadmaps developed for and in connection with CDW's federal customers; and

f. Personnel information, including but not limited to, the identities, roles, responsibilities, customer assignments and relationships, specialties, expertise, achievements, performance capabilities, and compensation structures including internal sales and commission metrics and processes.

167. CDW's confidential and trade secret information is related to products and services used in interstate and foreign commerce. CDW is a nationwide provider of technology solutions and services to commercial, federal, and other customers across the United States and internationally. CDW's business operations, customer engagements, and contractual relationships, including Navy Contract A, span multiple states and involve the procurement, delivery, and support of technology products and services across state lines.

168. CDW has taken and continues to take reasonable measures to maintain the secrecy of its confidential and trade secret information. Such measures include, without limitation, requiring employees to execute confidentiality agreements, as well as agreements governing the protection of proprietary business information, as a condition of employment; maintaining and enforcing written policies and procedures governing the handling, use, and protection of confidential information and trade secrets; restricting access to CDW's confidential and trade secret information to employees and personnel with a legitimate business need to access such information; maintaining secure and access-controlled electronic systems for the storage of confidential and proprietary business information, including password-protected systems, network security protocols, and data security measures; providing training to employees regarding their obligations to maintain the confidentiality of CDW's proprietary information; and taking active

steps to investigate and address unauthorized access to, or misappropriation of, CDW's confidential and trade secret information when discovered, including through the instant action.

169. CDW's confidential and trade secret information derives significant independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, CDW's competitors and other persons who could obtain economic value from their disclosure or use.

170. The value of CDW's confidential and trade secret information is evidenced by, among other things: (a) CDW's substantial investment in developing and maintaining such information; (b) CDW's ability to leverage such information to win and retain significant federal contracts, including the Navy Contract A; (c) the substantial efforts CDW's competitors, such as Mojave, undertake to obtain such information through improper means; and (d) the direct competitive advantage that possession of such information provides in bidding on and performing federal IT contracts.

171. Individual Defendants knew they had a duty to maintain CDW's confidential and trade secret information due to their confidentiality obligations, including contractual confidentiality obligations such as those under the Harrington Agreement and the Dobner Agreement. As Hogan is the founder of Mojave, Mojave has been on notice of Hogan's as well as other Individual Defendants' obligations.

172. Defendants have misappropriated CDW's confidential and trade secret information through improper means and in breach of duties owed to CDW.

173. Specifically, Mojave and Hogan misappropriated CDW's confidential and trade secret information regarding its relationships with its employees by exploiting such information to identify and target top performers to benefit Mojave and, upon information and belief, making

offers of employment superior to the terms of their respective CDW employments to entice such Recruited Employees to leave their CDW employments to join Mojave.

174. Moreover, upon information and belief, Defendants exploited their knowledge of CDW's confidential and trade secret information regarding CDW's OEM relationships to jump the line and accelerate Mojave's acquisition of OEM and SDVOSB certifications to ensure Mojave's operational capabilities in record time.

175. Hogan also, without any legitimate business reason, knowingly retained CDW's confidential and trade secret information after his resignation from CDW. In particular, he retained CDW emails between Mark Lafferty, CDW's Director, Department of Defense, and him discussing, among other things, details related to a particular contract, such as sales lead activities, performance, cost, and seller compensation from CDW.

176. And, Mojave, Hogan, and Harrington relied upon CDW's confidential and trade secret information regarding the Navy Contract A and customer to solicit the Navy Contract A and customer to fail to renew the Navy Contract A with CDW and, instead, go out to bid and, upon information and belief, award the Navy Contract A to Mojave.

177. Individual Defendants, while employed by CDW and entrusted with access to CDW's confidential and trade secret information in furtherance of their employment responsibilities, wrongfully acquired, copied, downloaded, transmitted, retained, and then disclosed, or will inevitably disclose CDW's confidential and trade secret information without authorization and in violation of their contractual and legal obligations to CDW.

178. Defendants misappropriated CDW's confidential and trade secret information by acquiring, receiving, using, and/or disclosing it with knowledge, or reason to know, that such

confidential and trade secret information was obtained from CDW through Individual Defendants' breach of their duties to CDW and through other improper means.

179. Defendants used CDW's confidential and trade secret information to unfairly and unlawfully compete against CDW.

180. Defendants' misappropriation of CDW's confidential and trade secret information was willful and malicious, undertaken with full knowledge that such information was CDW's proprietary and confidential trade secret information, and with the deliberate intent to injure CDW and obtain an unfair competitive advantage.

181. Upon information and belief, neither Hogan nor Mojave have taken actions to prevent Hogan, Harrington, Dobner, Watton, or Reindel from using or disclosing CDW's trade secret, proprietary, and confidential information, and any such actions would be ineffectual.

182. Individual Defendants have no doubt helped Mojave skip the proverbial line at the expense of CDW, design, develop, and create competitive offerings, and pursue advantageous business initiatives and partnerships by leveraging their knowledge of CDW's trade secret, proprietary, and confidential information.

183. Furthermore, where Individual Defendants fulfill similar roles at Mojave as they did at CDW, and CDW and Mojave are direct competitors, Defendants will continue to use CDW's trade secret, proprietary, and confidential information to their benefit.

184. CDW has no adequate remedy at law for such present and future harm, and therefore, it is entitled to equitable relief in addition to compensatory relief.

185. CDW has suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, threatened misappropriation, and inevitable misappropriation,

including diminution of its trade secret, proprietary, and confidential information, harm to its reputation, goodwill, customer relationships, and its competitive advantage.

186. Defendants' actions constitute willful and malicious violations of the DTSA.

187. Because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of CDW's rights, CDW is entitled to recover punitive damages from Defendants in an amount according to proof at trial.

**COUNT IV**
**Breach of Contract – Confidentiality**
**(Damages and Injunctive Relief)**
**Against Harrington and Dobner**

188. CDW realleges and incorporates by reference Paragraphs 1 through 187 as though fully set forth herein.

189. CDW and Harrington entered into a valid and enforceable written agreement pursuant to which Harrington agreed, among other things, to maintain the confidentiality of CDW's confidential and trade secret information, to use such information solely for CDW's benefit, and to return all confidential information and Company property upon the termination of his employment.

190. CDW and Dobner entered into a valid and enforceable written agreement, pursuant to which Dobner likewise agreed to maintain the confidentiality of CDW's confidential and trade secret information, to refrain from using or disclosing such information except as authorized by CDW, and to return all confidential information and Company property upon the termination of her employment.

191. The Harrington Agreement and the Dobner Agreement are valid and binding contracts supported by adequate consideration.

192. CDW fully performed all of its obligations under the Harrington Agreement and

the Dobner Agreement.

193. Harrington materially breached the Harrington Agreement by, among other things, retaining, using, and disclosing CDW's confidential and trade secret information, including Company customer information, OEM relationship information, pricing information, business strategies, and other confidential materials protected by the Harrington Agreement. Harrington further breached the Harrington Agreement by using and/or disclosing CDW's confidential and trade secret information for the benefit of himself and Mojave, a direct competitor of CDW, in violation of his contractual obligations.

194. Dobner materially breached the Dobner Agreement by, among other things, retaining, using, and/or disclosing CDW's confidential and trade secret information, including Company OEM relationship information, pricing information, business strategies, and other confidential materials protected by the Dobner Agreement. Dobner further breached the Dobner Agreement by using and/or disclosing CDW's confidential and trade secret information for the benefit of herself and Mojave, a direct competitor of CDW, in violation of her contractual obligations.

195. Each of Harrington's and Dobner's respective breaches were material and deprived CDW of the benefit of its bargain under the respective agreements.

196. As a direct and proximate result of Harrington's and Dobner's breaches of their respective agreements, CDW has suffered and continues to suffer substantial damages, including, without limitation, the loss of confidential and trade secret information, loss of competitive advantage, loss of customer goodwill and business opportunities, and other damages in an amount to be proven at trial.

197. Harrington's and Dobner's breaches of their respective confidentiality obligations

have caused, and unless enjoined will continue to cause, CDW immediate and irreparable harm, including the loss of confidentiality, competitive advantage, customer goodwill, and other injuries that are not readily ascertainable or fully compensable through monetary damages alone.

## COUNT V
**Breach of Contract – Non-Solicitation**
**(Damages and Injunctive Relief)**
**Against Harrington**

198. CDW realleges and incorporates by reference Paragraphs 1 through 197 as though fully set forth herein.

199. The Harrington Agreement is a valid and enforceable contract supported by adequate consideration.

200. CDW and Harrington did not engage in bad faith during negotiations regarding the terms of the Harrington Agreement.

201. Among other obligations under the Harrington Agreement, Harrington agreed and was obligated during and for a period of three (3) months following the separation of his CDW employment not to directly or indirectly solicit business from or attempt to provide products or services to any of CDW's customers or prospective customers.

202. This restriction is narrowly tailored to CDW customers and prospective customers with whom Harrington had contact while employed by CDW.

203. For the same three (3) month post-employment period, Harrington also promised not to recruit, solicit, or induce any CDW employee to leave his or her employment.

204. The temporal scope of three (3) months following Harrington's separation of employment is reasonable and limited.

205. The terms of the Harrington Agreement are not greater than required for the protection of CDW's legitimate business interests, including CDW's trade secret, proprietary, and

confidential information, business relationships, employee relationships, goodwill, innovation, and investments.

206. Harrington breached the Harrington Agreement by soliciting the Navy Contract A and customer to not renew the Navy Contract A with CDW, to go out to bid, and, upon information and belief, to award the Navy Contract A to Mojave.

207. Harrington also breached the Harrington Agreement by, upon information and belief, helping Hogan and Mojave to solicit and cause Dobner to leave her employ with CDW to join Mojave.

208. Harrington knew he had a duty not to solicit CDW's customers, prospective customers, and/or employees.

209. Harrington's promise not to solicit CDW's customers, prospective customers, and/or employees is and was necessary to protect CDW from harm, including harm to CDW's customer, prospective customer, business, and employee relationships, goodwill and investments, and competitive edge.

210. CDW has fully performed its contractual obligations owed to Harrington under the Harrington Agreement.

211. CDW has suffered and will continue to suffer damages as a result of Harrington's breach of contract, including without limitation, diminishing the value of CDW's trade secret, proprietary, and confidential information, harming CDW's business and employment relationships, eroding CDW's goodwill, innovation, and investments, and undermining CDW's competitive edge.

212. CDW has already lost millions in annual revenue due to Harrington's solicitation related to Navy Contract A.

213. CDW's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

214. CDW has demonstrated that Harrington, unless restrained, has already and will continue to engage in conduct that breaches the Harrington Agreement and causes harm to CDW.

215. The terms of the Harrington Agreement do not pose an undue hardship on Harrington.

216. The Harrington Agreement is not injurious to the public, and the grant of an injunction will not disserve the public interest.

217. Should this Court grant injunctive relief to CDW, the burden on Harrington would be slight compared to the injury to CDW if it is not granted. No injury to Harrington would result from an order requiring him to comport his actions under the Harrington Agreement.

**COUNT VI**
**Breach of Duty of Loyalty**
**(Damages)**
**Against Hogan, Harrington, Dobner, and Watton**

218. CDW realleges and incorporates by reference Paragraphs 1 through 217 as though fully set forth herein.

219. As its employees, Hogan, Harrington, Dobner, and Watton owed CDW a duty of loyalty, requiring them to act in CDW's best interests and to refrain from acting in a manner adverse to CDW's interests while employed.

220. Prior to their resignations, Individual Defendants violated their duty of loyalty to CDW by, among other things, using and exploiting CDW's confidential and trade secret information for the benefit of themselves and Mojave; retaining CDW's confidential documents, Company emails, and other proprietary information without authorization or legitimate business

purpose; and participating in the solicitation and diversion of CDW's employees, customers, and business opportunities to Mojave.

221. Harrington further breached his duty of loyalty by encouraging, assisting, and participating in the solicitation and inducement of Dobner and of the Navy Contract A and customer while he remained employed by CDW, including utilizing confidential and trade secret information concerning customer relationships, business needs, decision-makers, and pricing to facilitate those efforts.

222. Hogan also violated his duty of loyalty by, upon information and belief, directly soliciting and assisting in the solicitation and inducement of Harrington, of Dobner, of Watton, and other CDW co-workers, and of the Navy Contract A and customer while he remained employed by CDW, including utilizing confidential and trade secret information concerning customer relationships, employee performance and compensation specifications, business needs, decision-makers, and pricing to facilitate those efforts.

223. Additionally, Hogan breached his duty of loyalty by devoting CDW-compensated time and effort to creating, developing, planning, and growing Mojave rather than performing the duties for which CDW employed and compensated him. Instead of using his working hours to advance CDW's business interests, upon information and belief, Hogan used CDW time to formulate business strategies, develop the competing enterprise, cultivate prospective business opportunities, coordinate with others regarding the competing venture, and otherwise advance the interests of Mojave. By diverting his time, attention, and efforts away from CDW's business and toward the development of a competing enterprise while still employed by CDW, Hogan acted directly contrary to CDW's interests and materially breached his duty of loyalty.

224. On information and belief, Watton breached his duty of loyalty by devoting CDW-compensated time and effort to creating, developing, planning, and growing Mojave rather than performing the duties for which CDW employed and compensated him.

225. These actions benefit Individual Defendants and Mojave at CDW's direct expense.

226. As a direct and proximate result of Hogan's, Harrington's, Dobner's, and Watton's actions, CDW has been damaged in an amount to be determined at trial.

**COUNT VII**
**Aiding and Abetting Breaches of Duty of Loyalty**
**(Damages)**
**Against Mojave**

227. CDW realleges and incorporates by reference Paragraphs 1 through 226 as though fully set forth herein.

228. Mojave knew that Hogan, Harrington, Dobner, and Watton owed CDW duties of loyalty to act in the interests of CDW, including, but not limited to, acting in CDW's economic interest, not working with competitors to undermine CDW's business and relationships, maintaining CDW's confidential information and trade secrets, and acting in CDW's interests while employed by CDW.

229. Hogan, Harrington, Dobner, and Watton breached their duties of loyalty by, among other things, using and exploiting CDW's confidential and trade secret information for the benefit of themselves and Mojave; retaining CDW's confidential documents, Company emails, and other proprietary information without authorization or legitimate business purpose; and participating in the solicitation and diversion of CDW's employees, customers, and business opportunities to Mojave.

230. Mojave solicited Hogan, Harrington, Dobner, and Watton and knowingly induced them to breach their duties of loyalty through the provision of employment and benefits from

Mojave. Among other things, Mojave encouraged Hogan, Harrington, Dobner, and Watton, while they were still employed with CDW, to use and exploit CDW's confidential and trade secret information for the benefit of themselves and Mojave; retain CDW's confidential documents and other proprietary information without authorization or legitimate business purpose; and solicit and divert CDW's employees, customers, and business opportunities to Mojave.

231. Mojave knowingly accepted the benefits from the breaches of loyalty committed by Harrington, Dobner, Hogan, and Watton.

232. These actions benefited Mojave at CDW's direct expense.

233. As a direct and proximate result of Mojave's actions, CDW has been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

With respect to this Complaint, and based on the foregoing, Plaintiffs CDW LLC and CDW Government LLC pray for the following relief:

1. Entry of an injunction against Defendants;
2. For actual, compensatory, punitive, and exemplary damages to be determined at trial;
3. For unjust enrichment and disgorgement of profits to be determined at trial;
4. For Harrington's obligations pursuant to the Harrington Agreement's Non-Solicitation obligation to be tolled for a period of three months from the date a final Order is entered in this matter;
5. For Dobner's obligations pursuant to the Dobner Agreement's Non-Solicitation obligation to be tolled for a period of six months from the date a final Order is entered in this matter;
6. For reasonable attorneys' fees, costs, and expenses; and

7. Such other and further relief the Court deems just, including all fees and costs associated with this action.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs CDW LLC and CDW Government LLC hereby assert their right to a trial by jury on all counts so triable.

Dated: August 15, 2026

Respectfully submitted,

*/s/ Levi Giovanetto*

Daniel J. Collins (ARDC No. 6224698)
Levi Giovanetto (ARDC No. 6299855)
Matthew A. Tobias (ARDC No. 6344044)
Victoria W. Hubona (ARDC No. 6336069)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 N. Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (312) 499-6301
dcollins@sheppard.com
lgiovanetto@sheppard.com
mtobias@sheppard.com
vhubona@sheppard.com

*Attorneys for Plaintiffs*